UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 3:05-00209 |
| | ) | Judge Echols |
| WALTER PRENTICE DRAKE | ) | |

**MEMORANDUM**

Pending before the Court is Defendant's Motion to Suppress Statements (Docket Entry No. 24), to which the Government has responded in opposition (Docket Entry No. 25). An evidentiary hearing on the Motion to Suppress was held on April 7, 2006.

### I. FACTUAL BACKGROUND

The evidentiary hearing on the Motion to Suppress revealed the following to be the relevant facts.

Metro Park Rangers patrol the various parks and park buildings in Davidson County. Among them is the Cleveland Park Community Center (Center) located at 925 N. 6th Street in Nashville. Metro Park Police had received a large number of complaints about criminal activity occurring at the Center, which is located in a well-known high-crime area.

On March 2, 2006, Metro Park Rangers Curtis Avant and Richard Ellington were participating in an "aggressive patrol"[1] at the Center. A basketball tournament was scheduled to begin that night

---

[1] Rangers perform aggressive or heightened, more intense, patrols of problem areas within their jurisdiction.

1

and the rangers were going to provide security and screen the spectators for illegal weapons and other contraband.[2]

As Ranger Avant entered the Center, he noticed a large crowd of individuals at the back of the hallway. Ranger Avant, who was in uniform, noticed that upon seeing him, one individual wearing a ski jacket and black toboggan hat (later identified as the Defendant) took off running out the back door. Ranger Avant pursued the Defendant through the back door. Meanwhile, Ranger Ellington circled around the building to the back of the Center.

Upon exiting the back door, Avant saw the Defendant standing just outside the back door on the back step area. Defendant's right hand was cupped down at the bottom of his pleated ski jacket as if holding something, and Ranger Avant noticed what appeared to be down feathers coming out of the back of Defendant's jacket. Ranger Avant asked Defendant what he was doing to which Defendant responded something to the effect of "why are you messing with me?" Within about five seconds of this encounter, Ranger Ellington rounded the back corner of the building and quickly approached the Defendant from the rear. As he got closer, he noticed that Defendant's right hand was cupped around what appeared to be the pistol grip of a shotgun which was sticking out of the top back of Defendant's

---

[2]In order to screen the spectators, the rangers empty the Center and then allow the spectators to reenter the building after they have been "wanded" with a metal detection wand.

jacket. At that point he shouted "he's got a gun" and drew his service revolver. Ranger Avant immediately pulled his service revolver and Defendant suddenly turned and ran away towards the woods at the back of the lot. With Ranger Avant in pursuit, Defendant ran to the back of the lot, jumped a fence, ran into the woods, and continued up a hill towards a railroad track. Avant ran around the back fence and shouted the direction Defendant was running to Ranger Ellington. Ranger Ellington returned to his patrol car and headed toward the railroad tracks to cut-off the Defendant.

After a lengthy foot pursuit, Ranger Wells (who had joined the pursuit) captured Defendant on the railroad tracks. Rangers Wells and Avant then handcuffed the Defendant, led him down the hill, and placed him in Ranger Ellington's patrol car.

In the presence of Ranger Ellington, Ranger Avant read Defendant his <u>Miranda</u> rights from a card he carries in his pocket. Defendant did not invoke his right to remain silent and did not ask for counsel. Defendant stated he knew the routine and had "been through it before." He also said he had previously done twenty years of time and could do it again.

Defendant was not found in possession of the weapon previously tucked under his jacket when he was arrested. Ranger Avant and other rangers who had been called to the scene began to backtrack the escape route Defendant had taken. Defendant remained in the

3

custody of Ranger Ellington in the back seat of his patrol car.

When asked by Ranger Ellington's what he did with the gun, Defendant initially told Ranger Ellington he did not have a gun but instead it was a curtain rod. Shortly thereafter he recanted and told Ranger Ellington to look by the fence running along the back of the lot and they would find what he dropped. Ranger Ellington radioed this information to Ranger Avant who began to walk along the fence and found a shotgun with a pistol grip and Defendant's black toboggan hat lying on the ground in the area indicated by the Defendant.

Thereafter, Defendant was charged in this Court with being a felon in possession of a firearm in violation 18 U.S.C. §§ 922(g)(1) and 924. The instant Motion to Suppress followed.

## II. **APPLICATION OF LAW**

Defendant seeks to suppress the statements that he made at the time of his arrest on the grounds that the statements were obtained in violation of Miranda and as a result of an illegal seizure in violation of the Fourth Amendment. Both arguments must be rejected.

### A. *Miranda* Violation

"The prophylactic Miranda warnings are 'not themselves rights protected by the Constitution but [are] instead measures to insure that the right against compulsory self-incrimination [is] protected." Duckworth v. Egan, 492 U.S. 195, 202 (1988)(citation omitted). Hence, as a procedural safeguard, Miranda warnings are

4

"prerequisites to the admissibility of any statement made by a defendant." Miranda v. Arizona, 384 U.S. 436, 476 (1966).

In this case, Defendant's argument that his statements were obtained in violation of Miranda may be disposed of easily. Ranger Avant testified that he gave Defendant his Miranda warnings at the time Defendant was taken into custody and placed in Ranger Ellington's patrol car. Ranger Ellington confirmed this account. The Court credits this testimony and there is absolutely no evidence to the contrary. Accordingly, Defendant's argument that "no officer gave [him] any Miranda warning at the time of his arrest and before placing him in custody in Ranger Ellington's patrol vehicle," (Docket Entry No. 24 at 7), must be rejected as not supported by the evidence.

**B. Fourth Amendment Violation**

Defendant asserts that his statement relating to the location of the gun (or curtain rod) was obtained in violation of his Fourth Amendment rights because the statement came about as the result of an illegal seizure. On this score, Defendant asserts that his initial encounter with Ranger Avant on the stoop at the back of the center constituted an unsupportable investigatory stop. Consequently, the statement later made to Ranger Ellington must be suppressed as resulting from this initial unlawful stop.

As the parties recognize, there are three types of permissible encounters between police officers and the general public: "(1) the

5

consensual encounter, which may be initiated without any objective level of suspicion; (2) the investigatory detention, which, if non-consensual must be supported by a reasonable, articulable suspicion of criminal activity; and (3) the arrest, valid only if supported by probable cause." United States v. Avery, 137 F.3d 343, 352 (6th Cir. 1997). In this case, the initial encounter between Ranger Avant and Defendant was permissible either as a consensual encounter or as an investigatory detention.

### 1. Consensual Encounter

"[L]aw enforcement officers may approach an individual and ask general questions without having any reasonable suspicion of criminal activity, so long as the officers refrain from the type of intimidating behavior that would lead a reasonable person to believe that the person was not free to leave." United States v. Waldon, 206 F.3d 597, 603 (6th Cir. 2000). That is, "law enforcement officers do not violate the Fourth Amendment by merely approaching an individual on the street or in another public place, by asking him if he is willing to answer some questions, [o]r by putting questions to him if the person is willing to listen." Florida v. Royer, 460 U.S. 491, 497 (1983).

In this case, Defendant's initial contact with Ranger Avant on the steps of the Center was consensual. Ranger Avant had merely asked Defendant who stood waiting on the stoop what he was doing and Defendant responded. It was only after Ranger Ellington rounded the

corner and shouted "gun" that Defendant took flight. Up until then, Defendant was not "seized." See, California v. Hodari D., 499 U.S. 621, 625-26 (1991)(when a suspect flees at the sight of an officer, a "seizure" within the meaning of the Fourth Amendment does not occur until the suspect is physically apprehended or he actually submits to the authority of the officer).

**2. Investigatory Stop**

Even assuming that Defendant was "seized" when he was approached standing on the stoop, the seizure was lawful as a temporary detention in the form of an investigatory stop. Under Terry v. Ohio, 392 U.S. 1, 30 (1968), an officer may conduct a brief investigatory stop where the officer has a reasonable articulable suspicion that criminal activity may be afoot.

This case is governed by the Supreme Court's decision in Illinois v. Wardlow, 528 U.S. 119, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000). There, police officers in unmarked cars swooped into an area known for heavy narcotics trafficking. They observed Wardlow standing next to a building holding a plastic bag. Upon seeing the officers, Wardlow ran. He was apprehended and a handgun was discovered.

The Supreme Court held that Wardlow's unprovoked flight in a high-crime area gave rise to reasonable suspicion justifying a Terry stop and frisk. Id. at 124 ("[h]eadlong flight - wherever it occurs - is the consummate act of evasion: it is not necessarily indicative

7

of wrongdoing, but it is certainly suggestive of such"). The Court also emphasized that "it was not merely respondent's presence in an area of heavy narcotics trafficking that aroused the officers' suspicion, but his unprovoked flight upon noticing the police." Id.

In the present case, Ranger Avant had a reasonable basis to be suspicious of criminal activity so as to justify an investigatory stop of Defendant. The Center is located in a high crime area patrolled regularly by Metro Park Rangers. Upon first observing Ranger Avant in his uniform, Defendant immediately turned and ran out the back door of the Center. Ranger Avant pursued the Defendant and found him on the back stoop of the Center with his hand underneath his coat and what appeared to be small feathers floating out of the coat. Ranger Avant merely tried to converse with the Defendant about why he had run. Based on these facts, Ranger Avant had a reasonable suspicion of criminal activity to conduct a Terry stop. As such Defendant's seizure (if there was one) did not violate the Fourth Amendment.

### III. CONCLUSION

On the basis of the foregoing, Defendant's Motion to Suppress Statements (Docket Entry No. 24) will be denied.

An appropriate Order will be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE

8

Case 3:05-cr-00209   Document 32   Filed 04/21/06   Page 8 of 8 PageID #: 143